**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Charles Matthew SAVARD, Scott Robert Friedman, Defendants–Appellants.**

**No. 90–3422.**

United States Court of Appeals, Eleventh Circuit.

June 15, 1992.

Kinley I. Engvalson, Duncan, Engvalson & Mitchell, Ft. Myers, Fla., for defendants-appellants.

John M. Fitzgibbons, Tampa, Fla., for Scott Robert Friedman.

Susan M. Daltuva, Asst. U.S. Atty., Ft. Myers, Fla., Karla R. Spaulding, Asst. U.S. Atty., Tampa, Fla., for plaintiff-appellee.

Before TJOFLAT, Chief Judge, BIRCH, Circuit Judge, and HILL, Senior Circuit Judge.

TJOFLAT, Chief Judge:

Charles Matthew Savard and Scott Robert Friedman were found guilty of multiple offenses in this marijuana smuggling case. Both appeal their convictions. Friedman also appeals his sentence. We affirm the appellants' convictions, finding no merit in any of their claims of error. We set aside Friedman's sentence, however, because the district court erred in determining his sentence range under the Sentencing Reform Act of 1984, 18 U.S.C. §§ 3551–3586 (1988), and the guidelines promulgated thereunder (Sentencing Guidelines). Accordingly, we remand his case for resentencing.

## I.

Our analysis begins with the facts on which the jury verdict and sentencing were based. In the early morning of June 29, 1989, Special Agent Ronald Guthrie of the United States Customs Service (Customs) spotted the sailboat *Fantasea* tied up at the transient dock at the Naples, Florida Municipal Dock. Guthrie's attention was drawn to the *Fantasea* for several reasons. First, the vessel displayed "St. Thomas" in the United States Virgin Islands as its home port, and few vessels from other territories come into the Naples Dock. Second, the vessel appeared weathered; Guthrie could see crystalline salt indicating to him its likely arrival from rough seas. Finally, the sailboat had an inflatable dinghy tied on its deck and a sailboard lashed to its side; these items were not commonly seen on vessels traveling through the Naples area.

Based on these observations, Guthrie contacted the Customs Command Center in Miami and learned that the vessel had been boarded by the United States Coast Guard three days earlier in the Yucatan Channel, an area between the Yucatan Peninsula and the Southwest tip of Cuba, approximately 500 miles south-southwest of Naples. That the vessel had come from the Yucatan Channel was significant to Guthrie because that area was a "funnel" for vessels coming from the south with contraband. The origin of the ship was also significant because Naples was not a designated Customs reporting area; a boat could not, in compliance with the law, come directly into Naples from a foreign territory. It was a two-day trip from the Yucatan to Naples and Naples was quite a distance from the nearest designated reporting area (Key West, Florida).

The Customs Command Center also informed Guthrie that at the time of the Coast Guard boarding, individuals identified as Richard Edwin DeTamble and Charles Matthew Savard had been on board the *Fantasea* and that the search of the vessel had not revealed any contraband. Guthrie learned from the dock master's office that Savard had registered the boat for a one-night stay at Naples with departure on June 30. Guthrie, accompanied by Customs Agents Michael Marshall and Paul Voltaire, then boarded the *Fantasea*. Guthrie knocked by the hatchway and announced the presence of the agents. He knocked twice more before DeTamble opened the hatch. Below deck, along with DeTamble, were Savard and Scott Robert Friedman. Friedman invited the agents to come into the boat.

After the agents entered the boat, Guthrie asked for and received identification from Savard, DeTamble and Friedman. While Marshall left the ship to verify their identification and to make certain that this was indeed the vessel that had been stopped in the Yucatan Channel, Guthrie questioned each of the boat's occupants separately on deck. DeTamble and Savard both told Guthrie that they were being paid by the boat's owner, Joseph Alvarez, to deliver the vessel from a marina in Key West, Florida to the Tampa, Florida, area. DeTamble stated that the trip had taken one and one-half to two days while Savard stated that the trip had taken three days. Both DeTamble and Savard denied any knowledge of the vessel being foreign or being boarded by the Coast Guard in the Yucatan Channel.

Friedman told Guthrie that he was a tire salesman and a long time friend of Savard. He further stated that after Savard had called him on June 28 and told him that he

would be in Naples, Friedman decided to drive down to visit Savard on June 29.

When DeTamble was questioned a second time, Guthrie confronted him with the Coast Guard boarding information. DeTamble confirmed that the vessel had been boarded in the Yucatan Channel on its way from Ochoreos, Jamaica to Naples and admitted that the vessel had not cleared Customs. He also stated that he would have the boarding slip below.

At this time, Marshall returned to the ship and confirmed that it was the same boat that had been boarded three days earlier in the Yucatan Channel. Marshall also told Guthrie that his check in the Treasury Enforcement Communications System, the Customs' intelligence system, had disclosed Friedman as positive for smuggling. After receiving this information from Marshall, Guthrie followed DeTamble below deck and asked him for the Coast Guard boarding slip which DeTamble could not find.

■ The agents searched the boat[1] and uncovered a large quantity of marijuana.[2] After the marijuana was field tested, Friedman, Savard, and DeTamble were advised of their rights and arrested.[3] All three men were searched. Marshall found the missing Coast Guard boarding slip folded up in Friedman's left shoe.

On July 19, 1989, Friedman, Savard, and DeTamble were indicted by a Federal Grand Jury in the Middle District of Florida. The four count indictment charged conspiracy to import 100 kilograms or more of marijuana into the United States in violation of 21 U.S.C. § 963 (1988), count one; importation of 100 kilograms or more of marijuana, in violation of 21 U.S.C. § 952 (1988) and 18 U.S.C. § 2 (1988), count two; conspiracy to possess with intent to distribute 100 kilograms or more of marijuana in violation of 21 U.S.C. § 846 (1988), count three; and possession with intent to distribute 100 kilograms or more of marijuana in violation of 21 U.S.C. § 841(a)(1) (1988) and 18 U.S.C. § 2, count four.[4]

DeTamble pled guilty. On February 19, 1990 a jury trial commenced for Friedman and Savard. The jury returned verdicts of guilty on all counts against both defendants on February 23, 1990. On April 17, 1990, Friedman and Savard were sentenced. Friedman was sentenced to a term of imprisonment of eighty-seven months on each count to run concurrently to be followed by a period of supervised release of four years on counts two and four. Savard was sentenced to seventy months on each count to run concurrently to be followed by a term of supervised release of four years on Counts Two and Four.

Savard and Friedman each raises a number of challenges to his conviction.[5] We

1. The search constituted a border search, for which the agents needed no probable cause or even a suspicion to believe that criminal activity was afoot. *See United States v. Ramsey,* 431 U.S. 606, 616, 97 S.Ct. 1972, 1978, 52 L.Ed.2d 617 (1977); *United States v. Himmelwright,* 551 F.2d 991, 993–94 (5th Cir.1977).

2. A total of 567 pounds and 7 ounces of marijuana were removed from the *Fantasea.*

3. After Friedman's arrest, his Ford Bronco vehicle, which was parked near the *Fantasea,* was seized pursuant to 21 U.S.C. § 881(a)(4) (1988) as a vehicle that had been used to facilitate a narcotics transaction. After its seizure, the vehicle was subjected to an inventory search. Friedman challenges the validity of this search, *see infra* note 5, but as we indicate in the text, his challenge is meritless.

4. After it was learned that the man representing himself to be Richard Edwin DeTamble was in

actuality an international drug fugitive, Peter Collier Quackenbush, a superseding indictment was obtained. Quackenbush was listed by his true name and his alias, Richard Edwin DeTamble. A fifth count of possession of five or more false identification documents, in violation of 18 U.S.C. § 1028 (1988 & Supp. II 1990), was added against Quackenbush. The charges against Friedman and Savard remained the same.

5. Savard's claims on appeal are as follows: (1) testimony that he did not react upon being informed that the *Fantasea* was being seized was an impermissible comment on his exercise of his right under the Fifth Amendment to remain silent; (2) Guthrie's testimony expressing opinions regarding his training as a Customs agent, the origin of the marijuana, and the possible use of a sail bag to transport marijuana from the *Fantasea* impermissibly invaded the province of the jury as the finder of fact; (3) the Government failed to prove that the marijuana found on the vessel had been imported from foreign

reject these challenges as meritless; accordingly, they require no discussion. Friedman also challenges his sentence. He argues that the district court misapplied the Sentencing Guidelines when sentencing him. We agree and vacate his sentence.

## II.

■ Section 3C1.1 of the Sentencing Guidelines provides for a two-level increase in the defendant's base offense level when "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the ... offense...." U.S.S.G. § 3C1.1 (1991). The district court increased Friedman's base offense level by two points for obstruction of justice based upon the fact that the Coast Guard boarding slip was discovered in his left shoe.

The Sentencing Commission has clarified the types of conduct to which the obstruction enhancement is intended to apply. Most relevant to the instant case, the Commission has stated that enhancement is appropriate when the defendant has engaged in conduct such as

> destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding (*e.g.*, shredding a document or destroying ledgers upon learning that an official investigation has commenced or is about to commence), or attempting to do so; *however, if such conduct occurred contemporaneously with arrest* (e.g., attempting to swallow or throw away a controlled substance), *it shall not, standing alone, be sufficient to warrant an adjustment for obstruction unless it resulted in a material hindrance to the official investigation or*

> *prosecution of the instant offense or the sentencing of the offender.*

U.S.S.G. § 3C1.1, comment. (n. 3(d)) (emphasis added).

Friedman's secreting of the boarding slip contemporaneously with his arrest did not materially hinder the Government's investigation or prosecution of his crimes. The Coast Guard boarding slip contained the date and circumstances of the Coast Guard's boarding of the *Fantasea* in the Yucatan Channel, identification of the individuals aboard the boat at that time, and information about the vessel. At the time of Friedman's arrest, Customs agents already possessed all of this information. Prior to the boarding of the *Fantasea*, Guthrie contacted the Customs Command Center in Miami and learned that the vessel had been boarded three days earlier in the Yucatan Channel. Guthrie was given the names and birth dates of the two individuals aboard the vessel at the time of boarding—Charles Savard and Richard DeTamble. He was also told the name of the vessel, the document number, and the exact coordinates of the site of the boarding. Also prior to the boarding, Guthrie went to the dock master's office and checked the vessel registration documents. The registration slip gave the name of the vessel and was signed by Savard. This information matched the information that Guthrie received from the Customs Command Center. Later, when Guthrie and the other agents boarded the vessel, he collected identification from Savard, DeTamble, and Friedman. Marshall verified their identification and confirmed through the Customs Command Center that it was the *Fantasea* that had been boarded in the Yucatan and that Savard and DeTamble were aboard the vessel at that time. Finally, prior to the arrest, DeTamble admitted lying to the Customs agents and further admitted that he had been foreign with the vessel, had been

---

waters; and (4) the prosecutor, in her closing argument, impermissibly personalized the case to the jury by stating to the jury: "Think about the kind of stuff you would need if you were coming in from a foreign port loaded with marijuana."

On appeal, Friedman raises the following claims relating to his conviction: (1) Agent Marshall's testimony that Friedman requested an attorney following his arrest violated his rights

under the Fifth Amendment; (2) the admission at trial of evidence seized during a search of his person and of his vehicle and the admission of statements made by him subsequent to his arrest violated his rights under the Fourth Amendment because the evidence and statements were the product of his unlawful arrest; and (3) the evidence presented at trial was insufficient to establish that he was not just merely present

boarded by the Coast Guard in the Yucatan Channel, and had failed to clear Customs before entering the United States.

The obstruction adjustment to Friedman's base offense level was based solely on the fact that, at the time of his arrest, Customs agents discovered the Coast Guard boarding slip in his shoe. Friedman's act of placing the slip in his shoe did not result in a material hindrance to the Coast guard's investigation; thus, his act did not warrant the upward adjustment in his base offense level and the resulting enhancement of his sentence.[6]

### III.

For the foregoing reasons, we AFFIRM the convictions of Savard and Friedman, VACATE Friedman's sentence, and REMAND this case to the district court for resentencing in accordance with this opinion.

IT IS SO ORDERED.

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Jimmy Rogers TUCK, Defendant–
Appellant.**

**No. 91–8781.**

United States Court of Appeals,
Eleventh Circuit.

June 29, 1992.

aboard the *Fantasea* but actively involved in all crimes charged.

6. Friedman also argues on appeal that the district court erred in rejecting his argument that he played a minimal or minor role in the charged offenses and consequently denying his

Paul S. Kish, Federal Defender Program, Inc., Atlanta, Ga., for defendant-appellant.

F. Gentry Shelnutt, Jr., Asst. U.S. Atty., Atlanta, Ga., for plaintiff-appellee.

request under § 3B1.2 of the Sentencing Guidelines for a two-to-four-point downward adjustment to his base offense level. The evidence adduced at trial in this case, only a small part of which we have summarized in the body of this opinion, demonstrates that Friedman was neither a minimal nor a minor player in the

Before COX, Circuit Judge, CLARK *
and WELLFORD **, Senior Circuit Judges.

---

charged offenses. Thus, the district court correctly rejected Friedman's request for a downward adjustment to his base offense level.