**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-4106
_____

UNITED STATES OF AMERICA

v.

CHRISTOPHER WELSHANS,
Appellant
_____

Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 2-15-cr-00015-001)
District Judge: Honorable Donetta W. Ambrose
_____

Argued: January 16, 2018
_____

Before: AMBRO, RESTREPO, and FUENTES,
*Circuit Judges*.

(Filed: June 14, 2018)
_____

Lisa B. Freeland, Esq.
Renee D. Pietropaolo, Esq. [ARGUED]
1500 Liberty Center
1001 Liberty Avenue
Pittsburgh, PA 15222
        *Counsel for Appellant*

Soo C. Song
Laura Schleich Irwin, Esq.  [ARGUED]
700 Grant Street, Suite 4000
Pittsburgh, PA 15219
        *Counsel for Appellee*

_____

## OPINION OF THE COURT
_____

RESTREPO, *Circuit Judge*.

Appellant Christopher Welshans was convicted of distribution and possession of child pornography in violation of 18 U.S.C. § 2252.  In this direct appeal, Welshans raises two claims.  First, he argues that his due process right to a fair trial was violated because the prosecution informed the jury, through both evidence and argument, that his child pornography files included deeply abhorrent videos and images of bestiality, bondage, and acts of violence against very young children.  Second, Welshans raises a procedural sentencing claim, challenging the application of the obstruction of justice enhancement.

Regarding his first claim, we agree with Welshans on two points—that the challenged evidence was inadmissible under Rule 403 of the Federal Rules of Evidence and *United States v. Cunningham*, 694 F.3d 372, 391 (3d Cir. 2012), and that the prosecutor's closing argument improperly appealed to the passions of the jury. However, we conclude that the misconduct did not so infect Welshans's trial with unfairness as to violate due process. Therefore, we will affirm his conviction. As to Welshans's sentencing claim, we will reverse and remand for resentencing.

# I

## A

In February 2014, the Pennsylvania Office of Attorney General determined that child pornography was being shared by an Internet Protocol (IP) address associated with a subscriber later identified as Welshans's aunt. Law enforcement agents executed a search warrant on her home on March 21, 2014 at 7:30 a.m. The agents found no child pornography, but learned that Welshans, who lived nearby, used the wireless Internet at his aunt's house.

Immediately thereafter, half of the agents went to Welshans's house to set up surveillance and to make note of any people leaving or entering. The other agents quickly obtained a search warrant.

Around the same time, Welshans's aunt called him with a warning that police officers were "on their way" to his house, App. 497, and were "looking for stuff" involving his

3

computers, App. 495. At 9:30 a.m., Welshans began moving files into his laptop computer's recycling bin.

At 10:10 a.m., agents executed a search warrant at Welshans's home. Welshans, who was combative, was "detained," handcuffed, and removed from the house. App. 339. He was held by two agents at the rear of a marked police car, and later detained un-cuffed inside the cruiser.

Meanwhile, Welshans's laptop computer continued to move files into the recycling bin. As explained at trial, this process could run automatically because, after a user selects multiple files to drag into the recycling bin, the process runs until all of the selected files are moved. This process was interrupted at 11:05 a.m. by an agent, who discovered Welshans's laptop and pulled out its battery. By this time, approximately seven hundred and fifty files had been moved into the recycling bin. They were easily restored, and none were lost.

In total, the Government recovered an extensive collection of child pornography files from both the laptop and from Welshans's desktop computer—over ten thousand images and hundreds of videos. Welshans did not dispute that the recovered material was child pornography. Nor did he dispute that child pornography had been distributed through a file-sharing network from his laptop.

Welshans admitted that he was the sole user of his laptop and desktop computers. (A Government expert reached the same conclusion based upon a forensic review of them). Welshans also admitted that he used his aunt's wireless Internet, the IP address that distributed the child

4

pornography. He conceded that he installed and used a file-sharing network on his laptop, and that he was at his aunt's house on March 20, 2014—the last date that child pornography files were added to his laptop and the day before his arrest.

But Welshans disputed whether he *knew* that there was child pornography on his computers. He testified and denied any such knowledge, but offered "no explanation" for how child pornography "ended up on [them]." App. 513.

**B**

As stated above, the Government recovered an extensive trove of child pornography from Welshans's computers. Exactly what the jury heard about the content of these files is central to this appeal, and so we must describe this content in detail. *See Cunningham*, 694 F.3d at 377 n.8 (confronting the same problem).

This content, as will become clear, was particularly "loathsome" even within the universe of child pornography crimes. *Id.* at 381 n.10. Its particular nature elicits strong responses of disgust and anger. Therefore, for the sake of the reader, we will only summarize the evidence. This summary, it bears noting, should not be taken as a substitute for the actual trial evidence, which was far more explicit and which forms the basis for our Rule 403 analysis.

The parties addressed the content of the child pornography to be admitted at trial, in part, via pretrial motions. Welshans offered to stipulate that the videos and images recovered constituted child pornography as a matter

5

of law.  The Government rejected the proposed stipulation. Instead, it sought to introduce a small subset of the images and videos recovered and promised not to introduce exceedingly violent and graphic ones.  The Government went on to explain that, in light of this Court's decision in *Cunningham*, 694 F.3d at 391, it had "specifically excluded bondage" from the proffered videos to be shown to the jury. App. 52.  Providing one deeply disturbing example, the Government specified that it would not introduce videos "show[ing] a nine-year-old girl bound with yellow rope on her arms and legs being sexually abused by both an adult male and a dog.  We're not showing any of that . . . ."  App. 51.

As to the two videos to be shown to the jury, the District Court found that they were "prejudicial" and "disturbing," but that the unfair prejudice did not outweigh their probative value.  App. 58.  The District Court found that the selected videos were admissible under Rule 403 "[g]iven that the government is proposing this very limited, highly condensed and representative sample of the total amount of evidence that exists and also given the fact that the government has presented . . . limiting instructions." App. 58.

Pursuant to this pretrial ruling, the Government showed the jury two video clips, without sound, for approximately two and a half minutes.  The District Court gave cautionary instructions both before and after playing the videos and during the charge.

These two videos, however, were not the only evidence presented to the jury regarding the nature of the

6

child pornography recovered from Welshans's computers. While the Government did not show any videos or images it deemed inadmissible under *Cunningham*, it did tell the jury about them—and repeatedly. It introduced both testimony and exhibits that described horrific sexual acts of bestiality, bondage, and violence perpetrated on very young children, including babies.

To summarize the evidence at issue we begin with Exhibit 2. This Government Exhibit contained five, detailed, paragraph-length descriptions of abhorrent acts of bestiality, bondage, and violence against children. The descriptions include gruesome references to a young child being sexually victimized by man and a dog, being forcibly bound with rope, strapped with a belt, blindfolded, and forced to wear a choker collar. This Exhibit was sent into the jury room during deliberations. In addition, an agent read portions of Exhibit 2 aloud to the jury, including references to the child victim being subjected to bestiality and bondage.

Other exhibits reiterated the message that Welshans possessed deeply abhorrent videos and images of child pornography. The Government introduced disturbing file names and file paths that described, for example, the rape of a one year old baby, the anal rape of a child, and a sexual assault by a dog. These too were sent to the jury room during deliberations. A few of these file names were circled in red before the jury. *See* App. 332 ("I'll circle it here[.]"). The prosecutor and witnesses read others aloud to the jury. The jury also heard that the file names were consistent with their content. For example, an agent testified that file names including the terms "1yo, 2yo are indicative . . . of what the subject matter would be"—child pornography depicting

7

sexual assaults perpetrated on one and two year old toddlers. App. 406.

Emphasizing the point, the Government elicited testimony from three separate agents that the videos shown to the jury were not the worst of the child pornography recovered. One agent told the jury that there were "worse" videos depicting "bondage and bestiality." App. 295. Another agent testified that he found "child pornography involving infants." App. 428. He told the jury that one thousand five hundred images "depict[ed] the rape or molestation of toddlers, babies, and infants." App. 430. He told the jury that the videos depicted acts of sexual violence on children, including "bondage" and "penetration of prepubescent children." App. 431-32. He testified that what the jury was shown was not "representative of the full substance" of the child pornography recovered because there were "far more violent representations on the computer, far younger victims on this computer." App. 442. Another agent testified that there were "worse images or videos," in which a child known to the testifying agent "is bound by rope and belts and . . . forced to have sex with a dog." App. 467.

In addition to this evidence, the Government's opening and closing statements also highlighted the horrific nature of some of the child pornography recovered from Welshans's computers. During its opening statement, the prosecutor told the jury that the videos to be shown were "not nearly the worse [sic] of this selection" and "not the most violent." App. 252-53. In closing, the prosecutor "pull[ed] up Exhibit 2" and asked the jury to "[r]emember some of the things . . . read to us, some of the horrible, disgusting terms . . . read to us that the defendant possessed and distributed." App. 658.

8

The Government went on to argue that "[t]here were images and videos of a little girl, a child being forced to do horrible things with dogs, a child being tied up, bound, collar around her neck, naked." App. 658. The Government argued to the jury "[w]hat you saw wasn't the most violent, it wasn't the most horrific, it wasn't the worse of the worse [sic] . . . It was a small cleaned-up portion just so you as the jurors would have the evidence . . . ." App. 659.

## C

The jury convicted Welshans of distribution and possession of child pornography. 18 U.S.C. §§ 2252(a)(2), (b)(1), (a)(4)(B). At sentencing, the District Court applied numerous Sentencing Guideline enhancements for specific offense characteristics, including enhancements for material involving "a prepubescent minor or a minor who had not attained the age of 12," for material portraying "sadistic or masochistic conduct or other depictions of violence; or . . . sexual abuse or exploitation of an infant or toddler," and for the number of files involved. U.S.S.G. §§ 2G2.2(b)(2), (4), (7)(D).

The District Court also applied a two-level enhancement for obstruction of justice. U.S.S.G. § 3C1.1. It found that the enhancement applied because Welshans moved files into his laptop's recycling bin in a "panic" after receiving a call from his aunt that the police were on their way to his house. App. 1053. This enhancement increased the offense level to 39. Welshans had a criminal history score of zero, which produced a Guideline range of 262 to 327 months. The Court varied downward to offense level 34, resulting in a final Guideline range of 151 to 188 months. It

9

sentenced Welshans to the low end of the Guidelines range: 151 months' imprisonment and 10 years' supervised release. This timely appeal followed.

## II

The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742. We review an unpreserved prosecutorial misconduct claim for plain error. *Gov't of the Virgin Islands v. Mills*, 821 F.3d 448, 456 (3d Cir. 2016). The plain error test requires (1) an error; (2) that is "clear or obvious"; and (3) "affected the defendant's substantial rights . . . which in the ordinary case means he or she must 'show a reasonable probability that, but for the error,' the outcome of the proceeding would have been different." *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1343 (2016) (quoting *United States v. Dominguez Benitez*, 542 U.S. 74, 76, 82 (2004)). If these conditions are met, we will exercise discretion to correct the error if it "seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* (quoting *United States v. Olano*, 507 U.S. 725, 736 (1993)). We exercise plenary review of a district court's interpretation of the Sentencing Guidelines and review its factual findings for clear error. *United States v. Miller*, 527 F.3d 54, 75 (3d Cir. 2008).

## III

In his first claim, Welshans asserts that the Government committed prosecutorial misconduct by informing the jury, through evidence and argument, that the child pornography recovered included deeply disturbing acts

of bestiality, bondage, and the violent sexual assault of very young children. We agree with Welshans that the prosecution crossed the line. Nevertheless, we conclude that the errors did not render his trial fundamentally unfair.

**A**

The Due Process Clause of the Fifth Amendment guarantees the right to a fair trial including the right to be free from prosecutorial misconduct. *See United States v. Liburd*, 607 F.3d 339, 343 (3d Cir. 2010). Our analysis of a prosecutorial misconduct claim proceeds in two steps. *Id.* at 342. First, we consider whether there was misconduct. "If so, we proceed to determine whether that misconduct 'so infected the trial with unfairness as to make the resulting conviction a denial of due process,'" taking into account the entire proceeding. *United States v. Repak*, 852 F.3d 230, 259 (3d Cir. 2017) (quoting *Mills*, 821 F.3d at 456 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974))). We consider "the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant." *Moore v. Morton*, 255 F.3d 95, 107 (3d Cir. 2001).

**B**

At the initial step of our analysis, Welshans asserts that the prosecution committed misconduct in two ways: (1) that it "systematically inject[ed] inadmissible . . . evidence" at trial, *United States v. Morena*, 547 F.3d 191, 194 (3d Cir. 2008), and (2) that the prosecutor's closing argument crossed the line by inflaming the passions and emotions of the jury, *see, e.g.*,

11

*Mills*, 821 F.3d at 458, 460. We consider each allegation in turn.

**1**

The Government may run afoul of the defendant's due process right to a fair trial by "systematically injecting inadmissible . . . evidence" at trial, *Morena*, 547 F.3d at 194, thereby "permeat[ing] the proceedings with prejudice[,]" *id.* at 196. Welshans argues that the Government did so in his case by repeatedly introducing evidence that the child pornography recovered involved abhorrent acts of bestiality, bondage, and the violent sexual assault of very young children. For the reasons below, we agree.

The central issue raised by Welshans's claim is whether the evidence introduced by the Government was, in fact, inadmissible. To answer this question, we begin with the premise that, as a rule, the Government is "entitled to prove its case free from any defendant's option to stipulate the evidence away." *Cunningham*, 694 F.3d at 387 (quoting *Old Chief v. United States*, 519 U.S. 172, 189 (1997)).[1]

---

[1] In *Old Chief*, the Supreme Court acknowledged and reiterated "the familiar, standard rule that the prosecution is entitled to prove its case by evidence of its choice, or more exactly, that a criminal defendant may not stipulate or admit his way out of the full evidentiary force of the case as the Government chooses to present it." 519 U.S. at 186-87. But the Court recognized an exception to that rule for proof that a defendant is a felon and so may not possess a firearm. The felony conviction is relevant solely to "a defendant's legal status, dependent on some judgment rendered wholly

We go on to consider, however, that the Government's evidence "remains subject to [Federal] Rule [of Evidence] 403," *id.* at 388, which allows the court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice . . . or needlessly presenting cumulative evidence," Fed. R. Evid. 403. A district court has broad discretion in conducting this analysis, provided that its reasoning is on the record. *See United States v. Bailey*, 840 F.3d 99, 117 (3d Cir. 2016); *United States v. Sampson*, 980 F.2d 883, 889 (3d Cir. 1992).

In *Cunningham*, we held that Rule 403 was violated when the district court admitted two particularly prejudicial videos of child pornography. *Cunningham*, 694 F.3d at 391. On the facts of that case, those two videos, which "portray[ed] bondage or actual violence," should not have been admitted. *Id.* at 390.

Our Rule 403 holding in *Cunningham* was based in part on the District Court's failure to review the videos themselves before deciding to admit them, and, in part, on the "extremely limited" probative value of the two videos. *Id.* at 383-87, 391. We reasoned that, while the videos had some probative value, it was significantly reduced by the fact that

---

independently of the concrete events of later criminal behavior charged against him." *Id.* at 190. And the particulars of that past conviction are completely immaterial to the present charge before the jury. *Id.* at 190-91. So courts must allow defendants to stipulate to that fact and obviate proof of it. *Id.*

13

other child pornography videos were in evidence, producing "diminishing marginal returns." *Id.* at 389; *see also Bailey*, 840 F.3d at 122 (noting that "probative value is informed by the availability of alternative means to present similar evidence") (internal quotation marks and footnote omitted). We also held that the probative value was outweighed, both because other video clips were admitted and because the defendant stipulated to the criminal nature of the child pornography, which "is a factor in the Rule 403 balancing" that district courts must undertake notwithstanding *Old Chief*. *Cunningham*, 694 F.3d at 386 n.23, 389-90; *see also United States v. Finley*, 726 F.3d 483, 492 (3d Cir. 2013) (same).

As to prejudice, we held that the two videos were enormously prejudicial. *Cunningham*, 694 F.3d at 390. Reviewing descriptions of the videos (as they were not provided to the Court), *id.* at 391, we concluded they generated "intense disgust," far beyond even other child pornography, *id.* at 390 (quoting *United States v. Curtin*, 489 F.3d 935, 964 (9th Cir. 2007) (en banc) (Kleinfeld, J., concurring)). *See also United States v. Loughry*, 660 F.3d 965, 974 (7th Cir. 2011) (holding that videos depicting "men raping and ejaculating in the genitals of prepubescent girls, as well as young girls engaging in sexual acts with each other . . . [,] have a strong tendency to produce intense disgust"). Indeed, the two videos stood out because "their violent and sadistic character likely created 'disgust and antagonism' toward [the defendant,] which risked 'overwhelming prejudice' toward him." *Cunningham*, 694 F.3d at 390 (quoting *United States v. Harvey*, 991 F.2d 981, 996 (2d Cir. 1993)).

14

*Cunningham*, Welshans now argues, ought to apply not only to visual images presented to the jury, but also to written or testimonial descriptions with the same "violent and sadistic character." *Cunningham*, 694 F.3d at 390. As we acknowledged in *Cunningham*, verbal descriptions are less vivid than videos. *See id.* at 387. And in that case, we declined to adopt a *per se* rule. *See id.* at 391. Nonetheless, the Government's introduction of numerous, highly inflammatory written summaries is significant cause for concern.

In Welshans's case, the Government introduced highly inflammatory descriptions of child pornography depicting abhorrent acts of bestiality, bondage, and violence perpetrated on very young children, including babies. As in *Cunningham*, the probative value of this evidence was greatly diminished by the availability of other evidence. Most obviously, the Government showed the jury two video clips— themselves "prejudicial" and "disturbing," App. 58—of child pornography, lasting in total almost two and a half minutes. The admission of these videos rendered the probative value of the additional descriptions "minimal." *Cunningham*, 694 F.3d at 391 (internal quotation marks omitted). Moreover, the Government had extensive evidence that did not involve violent or sadistic content, and Welshans stipulated that the files recovered were child pornography. *See id.* at 386 n.23; *Finley*, 726 F.3d at 492.

The evidence at issue was immensely prejudicial. Reading the descriptions in Exhibit 2 and the related evidence elicits little more than a visceral response of disgust and anger. *See Cunningham*, 694 F.3d at 390. This point is seemingly obvious, but it has also been noted by several of

15

our sister Circuits. *See Curtin*, 489 F.3d at 957 (holding that the district court committed procedural error under Rule 403 by admitting, without first carefully reviewing every word of, a written description of a child "engaged in sexual acts of mutual oral copulation with, and masturbation of, a dog"); *id.* at 964 (Kleinfeld, J., concurring) (concluding that written descriptions of bestiality were unfairly prejudicial and reaching the same conclusion as to stories about incest); *United States v. Grimes*, 244 F.3d 375, 385 (5th Cir. 2001) (holding unfairly prejudicial written narratives depicting sexual violence, including "young girls in chains, a young girl in handcuffs, and references to blood"); *Harvey*, 991 F.2d at 996 (holding that descriptions of videos containing adult bestiality, sadomasochism, and acts involving human waste would "create disgust and antagonism toward [the child-pornography defendant]" and "were highly prejudicial and posed a substantial risk of inflaming the jury").

In short, this is the type of "highly reprehensible and offensive content that might lead a jury to convict because it thinks that the defendant is a bad person and deserves punishment, regardless of whether the defendant committed the charged crime." *Loughry*, 660 F.3d at 972. Thus, we agree with Welshans that inadmissible evidence was repeatedly injected at his trial. *See Morena*, 547 F.3d at 194.

**2**

Welshans not only challenges the admission of prejudicial evidence, but also the prosecution's closing argument—the second ground for his due process claim. At closing, prosecutors "may not cross the line and invite the jury to render a decision on grounds of bias, passion,

16

prejudice, or sympathy." *Mills*, 821 F.3d at 458. Rather, "[p]rosecutors . . . serve in positions of public trust . . . and must guard against the temptation to draw on jurors' passions instead of the evidence, particularly in the heat of trial." *Id.* at 460 n.10. We have repeatedly labeled as improper arguments that are inflammatory or amount to "appeals for jurors to decide cases based on passion and emotion arising from sympathy for the victim." *Id.* at 460 (alteration and internal quotation marks omitted); *see also United States v. Berrios*, 676 F.3d 118, 135 (3d Cir. 2012); *Moore*, 255 F.3d at 116-18.

Welshans argues that the prosecution inflamed the jury, invoking a visceral reaction, by referencing the despicable nature of some of the child pornography recovered—abhorrent depictions of bestiality, bondage, and violence against very young children. Specifically, during its closing argument, the prosecutor returned to Exhibit 2 and its detailed and graphic descriptions of the files. The prosecutor urged the jury to "[r]emember some of the things . . . read to us, some of the horrible, disgusting terms . . . read to us [that] the defendant possessed and distributed." App. 658. The prosecutor argued that "[t]here were images and videos of a little girl, a child being forced to do horrible things with dogs, a child being tied up, bound, collar around her neck, naked." *Id.* The prosecutor reiterated to the jury that the video evidence shown to them "wasn't the most violent, it wasn't the most horrific, it wasn't the worse of the worse [sic] . . . It was a small cleaned-up portion . . . ." *Id.*

These viscerally inciteful words did nothing more than appeal to the jury's raw passions and emotions, compounding the prejudicial potential of the summaries. *Cf. Cunningham*, 694 F.3d at 390 (noting that horrific, violent sexual acts

17

provoke feelings of "intense disgust"). As such, we agree with Welshans that the prosecutor crossed the line. Indeed, at oral argument, the Government conceded that at least some portion of its closing argument was improper. *See* Oral Argument at 23:48 ("agree[ing] that those words should not have been used"); *id.* at 24:03 (conceding that "[w]e realize that it shouldn't be done"). Thus, based upon the combination of the evidence admitted and the closing argument, we conclude that there was misconduct and that "these errors were plain—that is, they were clear or obvious." *Mills*, 821 F.3d at 460.

## C

This, however, does not end our inquiry. Having determined that misconduct occurred, we next consider whether it rises to the level of a constitutional violation. *See Liburd*, 607 F.3d at 342. We consider the severity of the prosecutorial misconduct, the curative instructions, and the strength of the evidence to determine whether the trial was "so infected . . . with unfairness as to make the resulting conviction a denial of due process." *Repak*, 852 F.3d at 259 (internal quotation marks omitted). The first two aspects of the record support Welshans; however, we conclude that the strength of the evidence is so overwhelming that it outweighs the other two considerations. *Mills*, 821 F.3d at 465.

The misconduct in this case was indeed pervasive. *See, e.g.*, *id.* at 462; *Morena*, 547 F.3d at 194-96. As described above, the Government repeatedly introduced exhibits that were read aloud; elicited testimony from various agents; and argued to the jury that the child pornography

18

recovered involved bestiality, bondage, and violent acts against very young children.

We next consider the District Court's curative instructions, which we presume the jury follows. *See Liburd*, 607 F.3d at 344. "The more severe the misconduct, the less effective the curative instructions—particularly when . . . [they] are not given immediately after the misconduct or when they do not direct the jury to ignore specific instances of misconduct." *Mills*, 821 F.3d at 462. In this case, the District Court gave several curative instructions regarding the videos shown to the jury. In contrast, there was no curative instruction specific to the prejudicial descriptions, which favors Welshans. *See, e.g.*, *Morena*, 547 F.3d at 197 (noting that a trial court's "general instruction was hardly a specific direction to disregard the [inadmissible] evidence"); *Loughry*, 660 F.3d at 975 (stating that a "single boilerplate limiting instruction" did not cure the erroneous admission of uncharged "hard core" pornography).

This brings us to the strength of the evidence. "The quantum or weight of evidence is crucial to determining whether prosecutorial misconduct was so prejudicial as to result in a denial of due process." *Liburd*, 607 F.3d at 344 (alterations and internal quotation marks omitted). In this analysis, notably, we do not merely consider the sufficiency of the evidence. *See Morena*, 547 F.3d at 197. We also take into account whether the misconduct "shaped the development of the record evidence . . . or the trial strategy pursued by either party." *Liburd*, 607 F.3d at 345. Where the defense raised involved witness credibility, we take into account how the prosecutorial misconduct may have "affected the jury's credibility determination." *Mills*, 821 F.3d at 463.

19

The evidence against Welshans was overwhelming. There is no dispute as to any of the following facts: his laptop and desktop computers contained child pornography. Welshans was the sole user of the two computers. He installed and used a file-sharing network on his laptop. The laptop's file-sharing network was used to distribute child pornography. Welshans used the Internet account from which the child pornography was distributed. He was at his aunt's house, where the files were shared, on the last day his laptop accessed child pornography.

Despite all of this, Welshans asked the jury to find—on the basis of his credibility alone—that he did not know that there was child pornography on his computers. We cannot hold that the Government's misconduct affected this credibility determination. Rather, Welshans's claim that he lacked knowledge of the child pornography was "irreconcilable with both the testimony and the physical evidence at trial." *Mills*, 821 F.3d at 464. Welshans provided no plausible explanation for how child pornography could have been amassed and stored on his computers without his knowledge. Child pornography was found on both his laptop and desktop computers. The number of files was immense—over ten thousand images and hundreds of videos. Not only that, Welshans tried to rid himself of the evidence at the last minute—albeit ineptly—when his aunt called to tell him that the police were en route "looking for stuff" involving his computers. App. 495. In short, the overwhelming strength of the evidence "weighs decisively against [Welshans] and is dispositive in this case." *Mills*, 821 F.3d at 463. Thus, we conclude that, despite the prosecutorial misconduct that occurred, his trial was not fundamentally unfair. *See id.* at 465.

20

**IV**

In his second claim Welshans challenges a procedural aspect of his sentencing hearing—that the District Court improperly applied the obstruction of justice enhancement. We agree and will remand for a new sentencing hearing at which the enhancement shall not apply.

**A**

Section 3C1.1 of the Sentencing Guidelines provides a two-level enhancement for obstruction of justice where, *inter alia*, the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction." U.S.S.G. § 3C1.1. As we have explained "'[w]illfully' in this context means 'deliberately or intentionally; in other words, not negligently, inadvertently, or accidentally.'" *United States v. Douglas*, 885 F.3d 145, 152 (3d Cir. 2018) (quoting *United States v. Jenkins*, 275 F.3d 283, 287 (3d Cir. 2001)). However, "the conduct to which [Section 3C1.1] applies is not subject to precise definition." U.S.S.G. § 3C1.1, cmt. n.3. "Obstructive conduct can vary widely in nature, degree of planning, and seriousness." *Id.* The enhancement "is not an invitation to consider every instance in which a defendant acted in a blameworthy fashion." *Jenkins*, 275 F.3d at 289.

To better delineate the bounds of this enhancement, the Sentencing Commission has provided examples in Application Notes 4 and 5. *See* U.S.S.G. § 3C1.1, cmt. n.3. We give these Application Notes "controlling weight unless . . . plainly erroneous or inconsistent with the regulation,"

21

something the Government does not here allege. *United States v. Landmesser*, 378 F.3d 308, 313 (3d Cir. 2004) (internal quotation marks and citation omitted); *see also United States v. Knobloch*, 131 F.3d 366, 372 (3d Cir. 1997).

Application Note 4 generally gives "examples of the types of conduct to which this adjustment is intended to apply." U.S.S.G. § 3C1.1, cmt. n.3. Application Note 5 provides that "some forms of obstructive conduct—including fleeing from arrest, providing incomplete or misleading information during a presentence investigation, and making false statements while not under oath—do not merit the enhancement." *Jenkins*, 275 F.3d at 290 (citing U.S.S.G. § 3C1.1, cmt. n.5).

The specific note before us is Application Note 4(D). It provides that the obstruction of justice enhancement applies to some, *but not all*, acts of destroying or concealing evidence. U.S.S.G. § 3C1.1, cmt. n.4(D). Specifically, Application Note 4(D) states that Section 3C1.1 applies to

> destroying or concealing . . . evidence that is material to an official investigation or judicial proceeding (e.g., shredding a document or destroying ledgers upon learning that an official investigation has commenced or is about to commence), or attempting to do so; *however, if such conduct occurred contemporaneously with arrest (e.g., attempting to swallow or*

22

> *throw away a controlled substance), it shall not, standing alone, be sufficient to warrant an adjustment for obstruction unless it results in a material hindrance to the official investigation or prosecution* of the instant offense or the sentencing of the offender;

*Id.* (emphasis added).

As is particularly relevant here, if the destroying or concealing (1) "occurred contemporaneously with arrest," but (2) did not "result[] in a material hindrance to the official investigation or prosecution" of the case, then Section 3C1.1 does not apply. *Id.*

**B**

Welshans argues that the both premises of Application Note 4(D) obtain and, therefore, that Section 3C1.1 is inapplicable. We address each premise in turn.

**1**

We begin by asking whether Welshans was destroying or concealing evidence "contemporaneously with arrest" when he moved files into his laptop's recycling bin in a "panic" after receiving a call from his aunt that the police were on their way to his house. App. 1053.

In this phrase, the term "contemporaneous" is highly context-dependent. While courts use the term "to mean

23

'close in time,' it is a relative term." *Small Bus. in Telecomms. v. FCC*, 251 F.3d 1015, 1022 n.9 (D.C. Cir. 2001). Indeed, depending on the context, "contemporaneous" could mean minutes or years. *Id.* (collecting cases); *see also Contemporaneous*, The Random House Dictionary of the English Language (2d ed. 1987) (defining contemporaneous as "living or occurring during the same period of time; contemporary").

That the Sentencing Commission chose such a flexible term is unsurprising given the text of Application Note 3. It observes that "the conduct to which [Section 3C1.1] applies is not subject to precise definition" and that its applicability is best determined through examples. U.S.S.G. § 3C1.1, cmt. n.3. Just so, we draw upon illustrative cases to better understand the meaning of "contemporaneous" for the purposes of Application Note 4(D).

The most closely analogous case, cited by Welshans, is *United States v. Norman*, 129 F.3d 1393, 1400 (10th Cir. 1997). There the defendant ran a stop sign, causing a car accident. *Id.* at 1395. He immediately left his car and began to hide an item in the dirt, as lay witnesses looked on. *Id.* at 1396. The defendant was still kicking the dirt when the police arrived. *Id.* At sentencing, the district court applied the obstruction of justice enhancement, but the Tenth Circuit reversed. It held that the defendant acted "contemporaneously with arrest" under Application Note 4(D) even though he began hiding the item before the police arrived because he "understood that his failure to stop caused

the accident, and that he would be questioned and detained as soon as the police arrived." *Id.* at 1400.[2]

Also illustrative is *United States v. Savard*, 964 F.2d 1075, 1078 (11th Cir. 1992). The police knocked and announced their intent to search a boat, and the conspirators hid a Coast Guard boarding slip in a shoe. *Id.* at 1076-77. The agents then entered the boat where some agents questioned the conspirators and one agent left to investigate further. *Id.* After the agent returned, they searched the ship, and ultimately arrested the conspirators. *Id.* The Eleventh Circuit held that hiding the boarding slip occurred "contemporaneous with arrest" for the purposes of Application Note 4(D). *Id.* at 1078. This was so even though there was an interval—consisting of the investigation and search—between the act of hiding the boarding slip and the defendant's subsequent arrest. *See Norman*, 129 F.3d at 1400 (citing *Savard* for this point); *see also* Dissenting Op. at 5 (acknowledging that "there was a gap between the obstruction and arrest"). Therefore, under *Savard*, "contemporaneous" must be defined more flexibly than the dissent's position that

---

[2] The dissent emphasizes that in *Norman*, as noted above, the defendant was kicking the dirt when the police arrived. But Welshans too was continuing to delete files when the police entered his home. While the dissent would make much of the fact that Welshans was not "actively" concealing evidence, Dissenting Op. at 4; *see also id.* at 1, the Guidelines make no such distinction between active and passive concealment.

the conduct necessarily occur "just prior to arrest." Dissenting Op. at 3 (citation omitted).[3]

In contrast, our sister Circuits have held that defendants who acted while detained, away from the scene, post-arrest did not act "contemporaneously with arrest." *See United States v. Hinojosa*, 749 F.3d 407, 416 (5th Cir. 2014) (defendant made phone call from jail post-indictment); *United States v. Massey*, 443 F.3d 814, 821 (11th Cir. 2006) (defendant concealed drugs while handcuffed to hospital bed post-arrest); *United States v. Waldon*, 206 F.3d 597, 608-09 (6th Cir. 2000) (defendant made telephone call from jail six hours post-arrest); *United States v. Hankins*, 127 F.3d 932, 935 (10th Cir. 1997) (defendant made phone call from jail two days post-arrest); *but see United States v. Morales-*

---

[3] In *Savard*, the obstruction was "contemporaneous" despite a gap in time between the conduct and arrest. In the face of this holding, the dissent attempts to distinguish the gap in time in *Savard* from the analogous gap in time in Welshans's case based upon the physical position of the police. Yet in both cases, the police were closing in on the defendants physically. In *Savard*, the police were knocking at the hatch of the boat. In Welshans's case, agents were surveilling his house and the arresting agents were en route. Indeed, the dissent acknowledges that the surveilling agents had already arrived when Welshans acted, Dissenting Op. at 5, although it elsewhere elides this point by stating that Welshans acted before agents "arrived *to search*," Dissenting Op. at 1, 4, 5 (emphasis added). Moreover, the impact on Welshans was the same as in *Savard*—he acted in "panic," as the District Court found. App. 1053.

*Sanchez*, 609 F.3d 637, 640 (5th Cir. 2010) (where defendant made phone call from the back seat of a patrol car, the Government conceded that he acted "contemporaneously with arrest").[4]

Unlike these cases, Welshans moved files into his laptop's recycling bin in a "panic" after his aunt called to tell him that the police were on their way to his house. App. 1053. Around the time that Welshans acted, agents were surveilling his house; other agents arrived soon after with a search warrant, "detained," handcuffed, and held him in a police cruiser. App. 339. Under these circumstances, as in *Norman* and *Savard*, we conclude that Welshans acted "contemporaneously with arrest" for the purposes of Application Note 4(D).[5]

---

[4] Welshans's case does not require us to rule on the propriety of these decisions.

[5] The dissent characterizes our holding as resting solely on the fact that Welshans acted "upon learning of an investigation likely to result in arrest," and suggests that the result would be the same regardless of the interval between the defendant's conduct and arrest. Dissenting Op. at 5. This is not so. Rather, we rely on the totality of the circumstances, including that Welshans acted in a "panic," App. 1053, when he believed arrest was imminent, as agents were surveilling his house, and shortly before he was detained.

Furthermore, our holding will not produce the consequences invoked by the dissent. Critically, the dissent focuses on one element of the Application Note—obstructive conduct that occurs "contemporaneously with arrest"—even

27

**2**

The question that follows is whether Welshans's conduct "result[ed] in a material hindrance to the official investigation or prosecution of the instant offense." U.S.S.G. § 3C1.1, cmt. n.4(D). Section 3C1.1 does not define "material hindrance." Application Note 6, however, defines a phrase with a common word, "material evidence." U.S.S.G. § 3C1.1, cmt. n.6 ("'Material' evidence, fact, statement, or information, as used in this section, means evidence, fact, statement, or information that, if believed, would tend to influence or *affect* the issue under determination.") (emphasis added). Consistent with this text, the Fifth Circuit has held that a material hindrance "requires, at the least, *an actual, negative effect* on either the course or result of the investigation." *Morales-Sanchez*, 609 F.3d at 641 (emphasis added). We agree.

In its brief, the Government did not argue that placing files in the recycling bin amounted to a "material hindrance." Rather, it took the position that Application Note 4(D) was

---

though the Guidelines also require that the conduct "result[] in a material hindrance to the official investigation." U.S.S.G. § 3C1.1 cmt. n.4(D). This is a conjunctive test: if the conduct occurs contemporaneously with an arrest but does not materially hinder the investigation, it does not qualify for the enhancement. As noted above, the deleted files were easily restored. Thus, our reading is not as far-reaching as the dissent suggests; a defendant is not "exempt from the . . . enhancement" if he permanently destroys evidence, even if his actions begin as soon as he "believe[s] he would be arrested." Dissenting Op. at 5.

"inapplicable" because Welshans did not act "contemporaneously with arrest." Gov't Br. 28; *see also id.* (arguing that material hindrance was not "the proper question" before the Court). This was a sound tactical choice, as none of the files in the recycling bin were lost. To the contrary, several witnesses testified that files in a computer's recycling bin are easily restored merely by clicking the mouse.

Still, at oral argument the Government appeared to contest the "material hindrance" issue for the first time. In response to questions from the Court, the Government argued that its investigation was materially hindered because it took "extra time" to verify that no files were lost, and because the issue was referenced at trial (notably, as evidence of guilt). *See* Oral Argument at 28:53 ("It took us time to go back through and determine [that no files were lost]"); *id.* at 29:15 ("Again we had to take the extra time to go ahead and look at those things. Plus it was a contested issue at trial."); *see also* App. 642 (consciousness of guilt jury instruction).

Because this contention was raised for the first time at oral argument, it is waived. *See, e.g.*, *United States v. Chapman*, 866 F.3d 129, 135 n.9 (3d Cir. 2017); *In re Grand Jury*, 635 F.3d 101, 105 n.4 (3d Cir. 2011). But even if we were to reach the Government's argument, we would hold that there was no material hindrance.

The Government's interpretation of "material hindrance" is far too broad. All acts of destroying or concealing evidence require at least some "extra time" to investigate and are potential trial issues. For example, Application Note 4(D) explicitly cites "throw[ing] away a

29

controlled substance" as an example of an act that may *not* warrant the obstruction of justice enhancement. U.S.S.G. § 3C1.1, cmt. n.4(D). If this act is contemporaneous with arrest and there is no "material hindrance," then the enhancement does not apply. *Id.* But under the Government's definition, there would always be a "material hindrance." For any time a defendant throws away drugs, the investigation takes at least some "extra time," and the act is a potential trial issue.

Illustrative cases further reinforce the point that the Government's interpretation of "material hindrance" is overly broad. At least one court has held that throwing cocaine out of a car window during a high speed chase does not, "standing alone, warrant the enhancement." *United States v. Giacometti*, 28 F.3d 698, 700 n.1 (7th Cir. 1994).

In another example, *Morales-Sanchez*, the defendant made a phone call from the back of a patrol car, asking his friend to report a truck as stolen. 609 F.3d at 639. The police then received a false report. *Id.* at 641. Even so, the Fifth Circuit held that the false report was not a "material hindrance" because there was no evidence that it "had any actual effect on the investigation." *Id.* It reversed the application of Section 3C1.1.

Likewise, in *Savard*, the Eleventh Circuit held that the defendant did not materially hinder the investigation by hiding a Coast Guard boarding slip because "Customs agents already possessed all of this information." *Savard*, 964 F.2d at 1078. This was so even though concealing the slip forced the agents to independently verify the information it contained. *Id.*; *see also United States v. Perry*, 991 F.2d 304,

312 (6th Cir. 1993) (holding that there was no material hindrance where the defendant placed robbery proceeds in a box and told a relative to hide it).

Just so, the Government was not materially hindered when Welshans moved files into the recycling bin. The files were easily restored, and none were lost. The fact that this process took "extra time" and was raised at trial as evidence of guilt in no way amounts to a "material hindrance" under Application Note 4(D). Thus, we conclude that the Section 3C1.1 enhancement was improperly applied.

## C

Finally, we conclude that remand is necessary. "By improperly applying the obstruction of justice enhancement, the District Court did not accurately calculate [Welshans's] Guidelines range." *Douglas*, 885 F.3d at 153. Although the Court imposed a downward variance, we "cannot be sure" that the erroneous calculation did not affect the sentence imposed. *Id.* at 154. In other words, "[t]he present case is not that rare case where we can be sure that an erroneous Guidelines calculation did not affect the sentencing process and the sentence ultimately imposed." *United States v. Langford*, 516 F.3d 205, 219 (3d Cir. 2008). Thus, we will reverse the imposition of the two-level enhancement under Section 3C1.1 and remand for resentencing.

## V

We will affirm the judgment of conviction, vacate the judgment of sentence, and remand for resentencing.

31

FUENTES, *Circuit Judge*, *concurring in part and dissenting in part*.

I agree with the majority's prosecutorial misconduct analysis. I disagree, however, with my colleagues' conclusion that the District Court erred in applying a sentencing enhancement for obstruction under U.S.S.G. § 3C1.1 because Welshans' attempted deletion of child pornography files from his laptop computer occurred "contemporaneously with arrest."

No one disputes that, on the morning Welshans was found in possession of thousands of child pornography images and videos, Welshans' aunt warned him that agents were en route to his home. After being warned, but 40 minutes before agents arrived to search his home, Welshans highlighted incriminating files on his laptop and selected "delete." Each file then sequentially moved to the laptop's recycle bin. Thereafter, Welshans stashed the laptop between couch cushions so it would not be discovered. Importantly, the process of moving files to the recycle bin occurred automatically and outside of Welshans' presence.

With this context in mind, it cannot be that Welshans' purposeful conduct—which, again, occurred *well before* agents arrived to search his home—falls within the "contemporaneously with arrest" exception to § 3C1.1's obstruction enhancement. By holding otherwise, the majority permits that limited exception to swallow the rule that obstructive conduct triggers an enhanced sentence.

Because Welshans clearly attempted to destroy material evidence, I would affirm the District Court's

1

imposition of the obstruction enhancement. I therefore respectfully dissent from Part IV of the majority's opinion.

**I.**

As the majority observes, § 3C1.1 provides for a two-level sentencing enhancement when "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction." The enhancement applies where, *inter alia*, a defendant attempts to destroy or conceal "evidence that is material to an official investigation or judicial proceeding."[1] In this regard, § 3C1.1 notes, by way of non-exhaustive example, that "shredding a document or destroying ledgers upon learning that an official investigation has commenced or is about to commence" qualifies for an obstruction enhancement.[2]

Nevertheless, if otherwise covered conduct "occurred contemporaneously with arrest," that conduct, "standing alone," is insufficient to warrant an obstruction enhancement "unless it results in a material hindrance to the official investigation or prosecution of the instant offense or the sentencing of the offender."[3] Relying on this exception, today the majority holds that the obstruction enhancement was improper because Welshans acted "contemporaneously

---

[1] U.S.S.G. § 3C1.1, cmt. n.4(D).

[2] *Id.*

[3] *Id.*

2

with arrest" and the Government was not materially hindered since the files were easily restored. I disagree.

The majority notes that "contemporaneous" is "a flexible term" which "could mean minutes or years."[4] However, "'[c]ontemporaneous' for purposes of § 3C1.1 has been construed to encompass obstructive conduct just prior to arrest, as when the police are at the defendant's door."[5] Accordingly, "this limited exception [] include[s] only conduct admitting a spontaneous or visceral or reflexive response occurring at the point arrest becomes imminent."[6] "It does not . . . apply to [] cool and deliberate actions."[7]

In finding that Welshans acted "contemporaneously with arrest," the majority relies heavily on the Tenth Circuit's decision in *United States v. Norman*.[8] However, *Norman* is distinguishable. In *Norman*, the defendant caused a car accident and attempted to hide drugs in dirt in front of his car. While it is true that the defendant "began hiding the [drugs]

---

[4] Maj. Op. at 24.

[5] *United States v. Hankins*, 127 F.3d 932, 935 (10th Cir. 1997) (citation omitted); *see also United States v. Perry*, 991 F.2d 304, 312 (6th Cir. 1993) (holding that a defendant's "hurried attempt to conceal [] evidence as the police stood at the front door was 'contemporaneous with arrest'").

[6] *United States v. Lamere*, 980 F.2d 506, 515 n.6 (8th Cir. 1992).

[7] *Id.*

[8] 129 F.3d 1393 (10th Cir. 1997).

3

before the police arrived,"[9] in concluding that he acted "contemporaneously with arrest," the Court stressed that the defendant was still attempting to conceal evidence when the police arrived.[10] In this regard, the Court observed that the defendant "was [] 'kicking at the dirt' in front of his car when the first officer" arrived and that he "was arrested within moments of that arrival."[11]

Here, unlike the defendant in *Norman*, Welshans was not actively engaged in obstructive conduct when the agents arrived to search his home. Rather, 40 minutes before the agents arrived, Welshans chose a large group of files, selected "delete," and hid the laptop between couch cushions. What's more, as the majority observes, after Welshans' conduct, the transfer of files to the recycle bin "could run automatically" without his presence at the computer.[12] Thus, in my view, Welshans' conduct was not the type of reflexive action excepted from the enhancement. To the contrary, Welshans' conduct appears calculated and purposeful.

The majority also relies on the Eleventh Circuit's decision in *United States v. Savard*.[13] In *Savard*, the Court held that a defendant's concealment of evidence in his shoe as agents knocked on the hatch of his boat occurred "contemporaneously with arrest," even though the defendant

---

[9] Maj. Op. at 24.

[10] *Norman*, 129 F.3d at 1400.

[11] *Id.*

[12] Maj. Op. at 4.

[13] 964 F.2d 1075 (11th Cir. 1992).

4

was not arrested until later.[14] Crucially, however, the obstructive conduct in *Savard* occurred when the agents announced themselves at the defendant's hatch door. Moreover, while there was a gap between the obstruction and arrest in that case, it was undisputed that agents remained on the boat for that entire period. In contrast, here, Welshans acted 40 minutes before agents arrived to search his home. Further, while it is true that agents were surveilling Welshans' home around the time of his conduct, none of those agents entered his home until the search warrant was executed, 40 minutes after Welshans acted.

Finally, on a practical level, interpreting "contemporaneously with arrest" to capture Welshans' conduct could produce absurd results. The following hypothetical, of which there are myriad variations, is illustrative. Suppose that, like Welshans, a defendant unsuccessfully tried to destroy evidence after learning that agents were en route. Further suppose that the defendant believed he would be arrested when the agents arrived. However, unlike our case, suppose that the agents had a car accident and were delayed until the next day. Under today's holding, our hypothetical defendant's failed attempt to destroy evidence would have occurred "contemporaneously with arrest"—and thus would be exempt from the obstruction enhancement—even though the agents were delayed.

Simply, today the majority indicates that—so long as there is no material hindrance—obstructive acts taken upon learning of an investigation likely to result in arrest occur "contemporaneously with arrest." I cannot agree with such a

---

[14] *Id.* at 1076, 1078–79.

result.  While our Court has not defined "contemporaneously with arrest," I disagree with the majority that Welshans' obstructive conduct meets this limited exception.  I would therefore find that the "material hindrance" requirement is inapplicable and the District Court was permitted to apply the obstruction enhancement even though the Government recovered the files before they were permanently erased.

## II.

For the foregoing reasons, while I join my colleagues in affirming Welshans' conviction, I dissent from the decision to reverse the application of the obstruction enhancement and remand for resentencing.